**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOE MARCONI, ADLINA MARCONI, RICHARD A. BENSON, LOUIS M. BENSON, DANIEL J. SOLIZ, MARGRET M. SOLIZ, MARY POPIEL, JOHN WULFF, and EMIL GOELLNER, individually and on behalf of others similarly situated, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 14 C 7291 |
| INDIANA MUNICIPAL POWER AGENCY, ISC, INC., RAJESHWAR G. RAO, SARGENT & LUNDY, LLC and SKELLY AND LOY, INC., | ) ) ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs are a proposed class of utility users and ratepayers from Batavia, Illinois who have purchased electricity generated by the Prairie State Energy Campus ("PSEC"), a power-generating facility located in southern Illinois. The complaint alleges that prior to Plaintiffs' purchase of electricity from PSEC, Defendants—Indiana Municipal Power Agency ("IMPA"), an Indiana power agency and partial owner of PSEC; Rajeshwar G. Rao, IMPA's President and CEO; ISC, Inc. ("ISC"), a subsidiary of IMPA and a consultant to the City of Batavia; and two consultants, Sargent & Lundy, L.L.C. ("Sargent & Lundy"), an Illinois Limited Liability Company, and Skelly and Loy, Inc. ("Skelly and Loy"), a Pennsylvania corporation—made various misrepresentations and omissions regarding, among other things, the cost and quality of the power PSEC would generate. Plaintiffs filed this putative class action in Illinois state court, alleging that Defendants' negligent misrepresentations resulted in harm, including a substantial increase in the rates Plaintiffs were required to pay for electricity.

Defendants IMPA and Rao removed the case to this court pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). That provision authorizes removal where there is "minimal diversity of citizenship" between the parties and the amount in controversy exceeds $5,000,000. As only one named Defendant is an Illinois citizen, and Plaintiffs are all Illinois business and property owners, CAFA's minimal diversity requirement is not in dispute. Plaintiffs, however, have moved to remand the case to state court [13], arguing that because Sargent & Lundy, an Illinois citizen, qualifies as a significant defendant under CAFA's "local controversy" exception to federal jurisdiction, remand to state court is mandatory. *See* 28 U.S.C. § 1332(d)(4). In the alternative, Plaintiffs argue that the court should exercise its discretion to remand in the "interests of justice" pursuant to 28 U.S.C. § 1332(d)(3). Also before the court are Defendants' motions [14, 45, 46, 50] to dismiss Plaintiffs' Amended Class Action Complaint ("Complaint") for failing to allege adequate state law claims for negligent misrepresentation against Defendants. As discussed below, Plaintiffs have failed to allege a claim for relief against the Defendants on their negligent misrepresentation theory. Therefore, Sargent & Lundy cannot be considered a "significant defendant" for purposes of CAFA, and Plaintiffs' motion to remand must be denied. The court also grants Defendants' motions to dismiss.

## BACKGROUND

Plaintiffs define their proposed class as "those ratepayers within Batavia who were charged by the Batavia Municipal Electric Utility department for electricity generated by the PSEC."[1] (Pls.' Am. Class Action Compl. [18-1], hereinafter "Compl." ¶ 124.) The Municipal Electric Utility ("MEU") is the sole City department responsible for generating or otherwise purchasing, distributing, and selling electrical energy within Batavia's corporate limits. (*Id.* ¶ 122.) According to Plaintiffs, Peabody Energy, Inc. ("Peabody")—the "world's largest private-

---

[1]   Plaintiffs state in their motion to remand, though they do not allege in their complaint, that "all of the proposed plaintiff class members are citizens of . . . Illinois." (Mot. to Remand at 4.)

sector coal-mining company" with ownership interests in "numerous high-sulfur coal reserves in southern Illinois"—announced plans to develop the PSEC project as part of Peabody's scheme to create a market in southern Illinois for its own reserves. (*Id.* ¶ 32.) The project would consist of a 1,620 megawatt ("MW") two-unit coal-fired electric generating facility, an adjacent high-sulfur coal mine, a coal combustion waste facility, and other ancillary equipment located in Washington, St. Clair, and Randolph Counties, Illinois. (*Id.* ¶ 33.) The project was eventually completed in 2012. (*Id.* ¶ 106.)

In November 2006, the City of Batavia ("Batavia" or "the City") entered into a "Power Sales Agreement" with the Northern Illinois Municipal Power Agency ("NIMPA") (*id.* ¶ 53), a joint municipal power agency (whose members are three Illinois municipalities, one of which is Batavia) and an investor in the PSEC. (*Id.* ¶ 13.) Batavia agreed to purchase from NIMPA a fixed share (50 MW) of electric capacity and energy generated at the PSEC. (*Id.* ¶ 53.) The Agreement called for NIMPA to bill Batavia for the City's pro rata share of NIMPA's debt investments in PSEC as well as for the City's pro rata share of PSEC's costs which NIMPA is obligated to cover. (*Id.* ¶ 54.) Thus, Plaintiffs allege, NIMPA's debt obligations to the PSEC and its share of PSEC's costs pass directly through NIMPA to Batavia. (*Id.*) Batavia's ratepayers must purchase electricity from the MEU. (*Id.* ¶ 123.) The PSEC costs that flow through NIMPA to Batavia, thus, eventually flow through MEU to the City's ratepayers. (*Id.* ¶¶ 54, 123.)

According to Plaintiffs, prior to NIMPA's participation in the PSEC project, Defendants made a series of misrepresentations and omissions to NIMPA and Batavia regarding the PSEC. As a joint municipal power agency, NIMPA "undertakes obligations to supply power and energy or related services to members [including Batavia] only when requested by its members to do so," (*id.* ¶ 42) and under the agreement establishing NIMPA, the Batavia City Council must approve NIMPA's participation in any contract or project. (*Id.*) Thus, NIMPA's participation in the PSEC project required the Batavia City Council's approval. (*Id.*) Plaintiffs allege that when Batavia was considering the risks associated with NIMPA's participation in the PSEC, it relied

on Defendants' misrepresentations and omissions.[2]  (*Id.* ¶¶ 130, 136, 142, 149, 156.)

Ultimately, Plaintiffs allege, Batavia's decisions to approve NIMPA's participation in the project and to enter into the Power Sales Agreement with NIMPA resulted in a "substantial increase in the electric rates" paid by Plaintiffs; caused Batavia to raise its sales tax to support the rate increase; bound Batavia for "decades" to an "unaffordable and unreliable source of power," thus damaging Plaintiffs' quality of life; and damaged Batavia's reputation, thus discouraging investment in the City, destabilizing its economy and further damaging Plaintiffs' quality of life. (*Id.* ¶¶ 134, 140, 146, 153, 160.)  Batavia and the other two municipalities comprising NIMPA are not the only Illinois municipalities to enter into such agreements for PSEC power.  For example, the Illinois Municipal Electric Agency ("IMEA"), which is comprised of 32 Illinois municipalities, owns a 15.17% interest in PSEC (accounting for approximately 240 MW of electric capacity) and covers its share of PSEC's operating costs.  *See* IMEA, *An Annual Report* (2014) 43, *available at*

http://www.imea.org/IMEA%20Annual%20Reports/2014AnnualReport.pdf (last visited Aug. 12, 2015).)

Two Defendants, Sargent & Lundy (an Illinois firm that, among other things, provides consulting services to energy businesses) and Skelly and Loy (a Pennsylvania engineering firm), analyzed the PSEC project and prepared due diligence reports, ultimately concluding that they had discovered no "fatal flaw" in PSEC's design or proposed approach.  ("Skelly and Loy Fatal Flaw Analysis," Ex. B to Pls.' Resp. to Skelly and Loy's Mot. to Dismiss [53-2], hereinafter "Skelly and Loy Fatal Flaw Analysis," 9; "Sargent & Lundy Due Diligence/Fatal Flaw Review," Ex. A to Def. Sargent & Lundy's Mot. Dismiss [22-1], hereinafter "Sargent & Lundy Due

---

[2]      Plaintiffs allege only that "Batavia" relied on Defendants' misrepresentations and omissions and do not specify whether "Batavia" means the Batavia City Council, a Batavia official, or some other entity.

Diligence/Fatal Flaw Review," 6.)[3] Plaintiffs allege that both Sargent & Lundy (Count IV) and Skelly and Loy (Count V) made negligent misrepresentations in the due diligence reports they prepared. (Compl. ¶¶ 152, 159.) The reports, however, were not prepared for NIMPA or Batavia. Rather, Skelly and Loy's report was prepared expressly for co-Defendant IMPA, the Indiana agency (Skelly and Loy Fatal Flaw Analysis 1), and Sargent & Lundy's report was prepared expressly for IMPA and other specified third parties. (Sargent & Lundy Due Diligence/Fatal Flaw Review 1–2.) According to Plaintiffs, the Sargent & Lundy Due Diligence/Fatal Flaw Review was a "technical due diligence study" of the proposed PSEC power plant. (Compl. ¶ 44.) The study was intended to provide "important corroborative information and analysis" to project participants regarding the plant's proposed design and construction. (*Id.* ¶ 45.) Instead, Plaintiffs allege, the report misrepresented the "construction cost and operating performance of the PSEC" as well as other unspecified "economic risks" associated with the project. (*Id.* ¶ 152.) Similarly, the Skelly and Loy Fatal Flaw Analysis was a "technical due diligence study" of PSEC's coal mine and was intended to provide information and analysis regarding the "status, quality and quantity of the coal reserves" (*id.* ¶¶ 44–45), but Plaintiffs allege that Skelly and Loy, too, misrepresented the "status, quality, and quantity of the coal at PSEC" as well as other unspecified "economic risks" associated with the project. (*Id.* ¶ 159.)

Though Skelly and Loy and Sargent & Lundy prepared their studies for IMPA (Skelly and Loy Fatal Flaw Analysis at 1–2; Sargent & Lundy Due Diligence/Fatal Flaw Review at 1–2), Plaintiffs allege that the studies influenced Batavia's decision to participate in the PSEC project. (*Id.* ¶ 46.) According to Plaintiffs, the City relied upon the contents of both studies as part of the

---

[3] Plaintiffs refer to the reports prepared by Sargent & Lundy and Skelly and Loy in their amended complaint as "Due Diligence Studies." (Compl. ¶¶ 44–46.) The complete Sargent & Lundy Due Diligence/Fatal Flaw Review and a portion of the Skelly and Loy Fatal Flaw Analysis were attached to Sargent & Lundy's motion to dismiss (Ex. A to Def. Sargent & Lundy's Mot. Dismiss [22-1]) and to Plaintiffs' response to Skelly and Loy's motion to dismiss (Ex. B to Pls.' Resp. to Skelly and Loy's Mot. to Dismiss [53-2]), respectively. Because these documents were "referred to in [Plaintiffs'] complaint and are central to [their] claim[s]," the court can properly consider them as part of the pleadings. *Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014).

"primary deliberative process" it undertook in deciding whether to become in involved in the PSEC project (*id.*), and by approving NIMPA's participation in PSEC, Batavia approved its own share of payment for both studies. (*Id.* ¶ 44.)

Plaintiffs' remaining claims concern allegedly negligent misrepresentations made by IMPA itself (Count I); its President and CEO, Rajeshwar G. Rao (Count III); and one of its subsidiaries, ISC (Count II). According to Plaintiffs, on May 17, 2004, with Batavia's existing contract for power with Commonwealth Edison ("ComEd") set to expire in 2007, the Batavia City Council passed a resolution hiring ISC as a consultant to study possible new electric supply options for the City. (*Id.* ¶ 36.) That same day, IMPA signed a letter of intent with Peabody to acquire partial ownership (presumably from Peabody, though Plaintiffs do not specify) in the PSEC project, but according to Plaintiffs, Batavia City Council members were not informed about that. (*Id.* ¶¶ 35–36.) On September 13, 2004, Rao presented ISC's study of Batavia's supply options to the City.[4] (*Id.* ¶ 37.) Plaintiffs allege that the study recommended Batavia's "participation in the PSEC project" at levels between 40 and 50 MW.[5] (*Id.*) Three days later, IMPA presented details of the PSEC project to NIMPA, including the project's total estimated cost. (*Id.* ¶ 38.)

Following IMPA's presentation to NIMPA, on October 11, 2004, IMPA and NIMPA entered into a Management Services Agreement, whereby IMPA would provide management, consulting, advisory, and operations services to NIMPA on various matters, including "selection of third-party long-term and short-term power supply arrangements." (*Id.* ¶ 39.) One week later, on October 18, 2004, the Batavia City Council approved NIMPA's participation in the PSEC project, including Batavia's payment of $39,809 for its share of development costs. (*Id.* ¶ 43.)

---

[4]     The Complaint states only that Rao presented the study to the "City of Batavia." (*Id.* ¶ 37.) It is thus unclear whether Rao presented the study to the Batavia City Council or to another municipal body.

[5]     The court understands this to mean that the study recommended that Batavia purchase or otherwise acquire between 40 and 50 MW of electric capacity from PSEC.

On three subsequent dates, the City Council authorized continued support for NIMPA's participation in the project and funded additional shares of development costs. (*Id.* ¶¶ 47–49). Eventually, on November 6, 2006, having already spent more than $1.8 million on development costs through NIMPA's participation in PSEC (*id.* ¶ 60), Batavia approved the Power Sales Agreement, obligating Batavia to purchase its fixed 50 MW share of PSEC electric capacity and energy from NIMPA. (*Id.* ¶ 53.) Under the Agreement, Batavia must purchase its entire share of electric capacity, regardless of either its own actual power needs or PSEC's actual power generation.[6] (*Id.* ¶ 53–57.) Approximately five months later, on April 16, 2007, the City Council reaffirmed its commitment to purchase its power share pursuant to the Power Share Agreement and withdrew its previously reserved rights to "(i) revoke its declaration of intent to purchase its Entitlement Share of the PSEC Project; or (ii) reduce its declared Entitlement Share of the PSEC project." (*Id.* ¶ 85.) By affirming its commitment to this "take-or-pay" Agreement and relinquishing its rights to reduce or revoke its share, Batavia became obligated to pay for its fixed share of PSEC's electric capacity whether PSEC generated any power or not. (*Id.* ¶ 86.)

Plaintiffs allege that before Batavia affirmed its commitment to the Power Share Agreement in April 2007, IMPA, Rao, and ISC were aware of, but failed to disclose, certain information that would have generated doubts about the PSEC project's prospects for success. For example, Plaintiffs allege that Defendants knew "as early as 2005"—as a result of a lawsuit Peabody brought against Wisconsin Public Power, Inc.—that the per-megawatt-hour cost projection of the power to be generated by PSEC was unattainable. (*Id.* ¶¶ 93–96.) Further, various industry reports in 2007 warned of rising construction costs for coal plants (*id.* ¶¶ 99–102), and increased construction costs led to the cancellation of numerous coal plant construction plans. (*Id.* ¶ 104.) In addition, according to Plaintiffs, Rao informed the Batavia

---

[6]     If PSEC does not provide NIMPA its entitlement share of electricity, NIMPA must purchase electricity elsewhere and will bill Batavia for the additional power. (Compl. ¶ 56.) Similarly, if Batavia does not need the entire entitlement share at a given time, it must sell the excess electricity to recoup the cost. (*Id.* ¶ 57.)

Public Utilities Committee, on April 20, 2007, that Peabody's co-developer in the PSEC project, CMS Enterprises, Inc., had withdrawn from the project (*id.* ¶ 70) and that the "capped price" engineering, procurement, and construction ("EPC") contract with lead construction and engineering firm, Bechtel Corporation, had been replaced by a "target price" EPC contract. (*Id.* ¶¶ 70, 113.)   Plaintiffs do not explain the relationship between the Batavia Public Utilities Committee and the City Council, nor do they specify whether the City Council itself was made aware of these developments.   But whether or not the City Council was made aware of these developments, Plaintiffs allege, Defendants failed to explain the effect the developments would have on the project or the economic risks they presented.  (*Id.* ¶¶ 113, 133, 139, 145.)

Plaintiffs' claim is that in initially approving and then reaffirming its commitment to the Power Share Agreement—eventually resulting in Plaintiffs' paying increased sales taxes and increased electric rates for unreliable power—Batavia relied on numerous misrepresentations or omissions of IMPA, Rao, and ISC.   Specifically, Plaintiffs allege that IMPA, Rao, and ISC misrepresented the following: the construction costs necessary to complete PSEC (*id.* ¶¶ 133, 139, 145); the economic risks associated with target price EPC contracts, such as the one entered into with Bechtel (*id.* ¶¶ 113, 133, 139, 145); the length of time necessary to complete construction of PSEC (*id.* ¶¶ 133, 139, 145*)*; the ultimate per-megawatt-hour cost of the power to be generated at PSEC (*id.* ¶¶ 77, 93, 133, 139, 145); the actual amounts of power that PSEC could be expected to generate (*id.* ¶¶ 109, 133, 139, 145); the viability of high-sulfur, high-ash coal as an energy source (*id.* ¶¶ 111, 133, 139, 145); the "maintenance issues and operating performance problems" associated with burning unwashed coal (*id.* ¶¶ 111, 133, 139, 145); the purportedly state-of-the-art and custom-designed nature of the equipment to be used at PSEC (*id.* ¶¶ 112, 133, 139, 145); and the necessity of Batavia's approving its final commitment to the PSEC project in an expedited timeframe by April of 2007.  (*id.* ¶¶ 69–88, 133, 139, 145.)   In addition, Plaintiffs allege that IMPA, Rao, and ISC negligently omitted the following information: the impact of CMS Enterprises' withdrawal from the PSEC project (*id.* ¶ 133, 139, 145), the

existence of rising construction costs for other coal-fueled power plants (*id.*), the unattainability of the stated cost for providing power from PSEC (*id.*), and the risk Batavia would assume by relying on a single source for much of its power.  (*Id.*)

**DISCUSSION**

Now pending before the court are Plaintiffs' motion to remand to state court [13] and Defendants' motions to dismiss Plaintiffs' complaint for failure to state a claim for relief [14, 45, 46, 50].  The court addresses the jurisdictional issues posed in Plaintiffs' remand motion before turning to the motions to dismiss.  Because Plaintiffs have failed to state a claim against any Defendant, including the non-diverse Sargent & Lundy, for negligent misrepresentation, the court concludes that Sargent & Lundy cannot be a significant defendant under CAFA, 28 U.S.C. § 1332(d)(4)(A)(i)(II)), and denies Plaintiffs' motion.  The court must also grant Defendants' motions to dismiss for Plaintiffs' failure to state a claim for relief.

**I.      Plaintiffs' Motion to Remand**

Defendants to an action brought against them in state court may generally remove the case to federal court if the action originally could have been brought there.  28 U.S.C. § 1441(a). When a federal court's jurisdiction is premised on diversity of citizenship pursuant to 28 U.S.C. § 1332, the parties must ordinarily be completely diverse.  But in the class action context, under CAFA, federal courts may exercise jurisdiction over actions in which *any* member of the plaintiff class is a citizen of a State different from *any* defendant, as long as the amount in controversy exceeds $5,000,000, exclusive of interest and costs.  28 U.S.C. § 1332(d)(2)(A).

Removing defendants bear the burden of establishing that CAFA's jurisdictional requirements are satisfied.  *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 447–49 (7th Cir. 2005).  There is no dispute that CAFA's minimal diversity requirements are satisfied here. As "ratepayers within Batavia," at least one Plaintiff assuredly is a citizen of Illinois, and four of the five named Defendants are alleged to be citizens of other States.  And though Plaintiffs dispute in their motion to remand that the amount in controversy exceeds $5,000,000 (Mot. to

9

Remand at 2), their own complaint alleges that Defendants' conduct has led to, among other financial costs, $19.8 million of increased power costs being passed on to Plaintiffs for payment.[7]

This court's jurisdiction therefore turns on whether any of CAFA's exceptions to federal jurisdiction apply to this case. Plaintiffs argue that two of CAFA's exceptions are relevant here: the mandatory so-called "local controversy" exception, 28 U.S.C. § 1332(d)(4)(A), and the discretionary "interests of justice" exception, 28 U.S.C. § 1332(d)(3). Plaintiffs carry the burden to show that the local controversy exception applies, *Hart v. FedEx Ground Package Sys., Inc.*, 457 F.3d 675, 680 (7th Cir. 2006), and as the Seventh Circuit has noted, CAFA's legislative history indicates a "strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant." *Id.* at 681 (internal quotation marks and citation omitted). Accordingly, the court considers Plaintiffs' local-controversy arguments with the understanding that Congress "intended the local controversy exception to be a narrow one, with all doubts resolved in favor of exercising jurisdiction over the case." *Evans v. Walter Indus., Inc.*, 449 F.3d 1159, 1163 (11th Cir. 2006) (internal quotation marks and citation omitted).

Plaintiffs nevertheless urge that the "local controversy" exception to CAFA jurisdiction established by 28 U.S.C. § 1332(d)(4)(A) applies here. Under that provision, the district court should decline to exercise jurisdiction over a case in which:

(I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;
(II) at least 1 defendant is a defendant—

    (aa) from whom significant relief is sought by members of the plaintiff class;

    (bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

    (cc) who is a citizen of the State in which the action was originally filed; and

---

[7] Though Plaintiffs disputed that the amount in controversy requirement was satisfied in their motion to remand (Mot. to Remand at 2), they appear to have abandoned this argument in their reply. (Pls.' Reply in Supp. Mot. to Remand [22].)

(III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed . . . .

28 U.S.C. § 1332(d)(4)(A)(i)(I)–(III).  The principal injuries alleged—increased rate payments for Batavia residents—were incurred within Illinois, and though Defendants dispute whether Illinois citizens comprise greater than two-thirds of the proposed class, the court assumes for purposes of argument that they do.  Therefore, the remaining question is whether Sargent & Lundy, the only Illinois Defendant, qualifies as a "significant defendant" under §1332(d)(4)(A)(i)(II).

For reasons explained in greater depth below, the court concludes that Plaintiffs have failed to state a claim for relief against any Defendant, including Sargent & Lundy, and therefore, as a matter of logic, Sargent & Lundy cannot be considered a significant defendant. *See Stephenson v. Standard Ins. Co.*, No. 10-cv-1081, 2013 WL 3146977, *8 (W.D. Tex. June 18, 2013) ("Logic dictates that if a plaintiff has not stated a claim against a certain defendant, that defendant cannot be liable for 'significant relief' and cannot be considered a 'significant' defendant."); *Magnum Minerals, L.L.C. v. Homeland Ins. Co. of N.Y.*, No. 13-cv-103, 2013 WL 4766707, *6 (N.D. Tex. Sept. 5, 2013) (concluding that plaintiff class was not seeking "significant relief" because they failed to state a claim).

Plaintiffs contend, without support, that for purposes of deciding this jurisdictional issue, the court "must accept as true that Plaintiffs could maintain their cause of action as pled against Sargent & Lundy." (Pls.' Br. on Court's Jxn and Mot. for Ruling on Mot. to Remand [39] 4.)  The court does not believe it is required to do so.  If this were true, class action plaintiffs could avoid federal jurisdiction under CAFA simply by including in their complaints any claims for "significant relief," even unsustainable ones, against non-diverse defendants.  CAFA's local-controversy exception surely was not intended to provide plaintiffs with such a loophole to avoid federal jurisdiction.  On the contrary, Congress expressed its "strong preference" that federal courts hear interstate class actions.  *Hart*, 457 F.3d at 680.  Indeed, in the similar fraudulent joinder context, courts will dismiss groundless claims against non-diverse defendants to restore

complete diversity and retain federal jurisdiction.  *See, e.g.*, *Walton v. Bayer Corp.*, 643 F.3d 994, 1001 (7th Cir. 2011) (affirming district court's dismissal, prior to ruling on remand motion, of non-diverse defendant for failure to state claim under state law).  It cannot be improper, therefore, for the court to consider the merits of Plaintiffs' claim against the non-diverse Defendant to determine whether it qualifies as "significant."

But even if the court were to adopt Plaintiffs' approach and assume that they have stated a claim for relief against Sargent & Lundy, Sargent & Lundy would still not qualify as a significant defendant under the local controversy exception.  The Seventh Circuit has yet to weigh in on the appropriate test courts should use in determining whether a defendant's alleged conduct forms a "significant basis" for plaintiffs' claims under the exception, and "significant basis" is nowhere defined within the statute.  Most courts to consider the issue have adopted a "comparison approach," weighing the alleged conduct of the local defendant against the conduct of the other co-defendants to determine whether the local defendant's alleged conduct is significant in relation to that of the other defendants.  *See Kurth v. Arcelormittal USA, Inc.*, No. 09-cv-108, 2009 WL 3346588, *9 (N.D. Ind. Oct. 14, 2009) (collecting cases).  Where this comparison shows that the local defendant's alleged conduct is peripheral or ancillary to that of the other defendants, the defendant's conduct is not considered to form a "significant basis" of the plaintiffs' claims.  *See, e.g.*, *Casey v. Int'l Paper Co.*, No. 07-cv-421, 2008 WL 8854569, *7 (N.D. Fla. Jan. 7, 2008) (conduct of an environmental manager at a mill alleged to have contaminated nearby properties did not form a "significant basis" of claims brought by properties' owners and residents but was "derivative and indirect at best" compared to that of the mill itself); *Dutcher v. Matheson*, 16 F. Supp. 3d 1327, 1336 (D. Utah 2014) (local defendants were "at most, ancillary defendants" whose conduct did not form a significant basis for plaintiffs' claims where the "majority of factual allegations" in plaintiffs' complaint pertained to actions taken by other defendants).

A comparison of Plaintiffs' allegations against Sargent & Lundy with those made against the other Defendants reveals that Sargent & Lundy is just such a peripheral or ancillary defendant. As discussed further below, a primary defect in Plaintiffs' complaint is the failure to allege a relationship between Plaintiffs and any of the Defendants that would give rise to a duty to convey accurate information to Plaintiffs. And the relationship between Plaintiffs and Sargent & Lundy (as well as Skelly and Loy) is particularly attenuated. Plaintiffs allege that IMPA, ISC, and Rao made negligent misrepresentations about PSEC directly to NIMPA, to Batavia, or to both (but not to Plaintiffs themselves). The vast majority of the 120-paragraph "Factual Allegations" section of Plaintiffs' complaint concerns IMPA's, ISC's, and Rao's allegedly misleading appeals to Batavia to approve NIMPA's participation in the PSEC project. Plaintiffs make no such allegation of direct misrepresentations to NIMPA or Batavia against either Sargent & Lundy or Skelly and Loy, however, and spend only three paragraphs describing their respective due diligence reports, which were prepared not for NIMPA or Batavia, but for IMPA. (Compl. ¶¶ 44–46; Skelly and Loy Fatal Flaw Analysis, at 1–2; Sargent and Lundy Due Diligence/Fatal Flaw Review, at 1–2.) From the face of Plaintiffs' complaint, therefore, Sargent & Lundy appears to be precisely the sort of "peripheral defendant" that Congress did not intend to cover under CAFA's local-controversy exception. *See* S. Rep. 109-14, at 40 (2005) ("[T]he local defendant must be a primary focus of the plaintiffs' claims—not just a peripheral defendant.").

Plaintiffs urge this court to follow *Anderson v. Hackett*, 646 F. Supp. 2d 1041 (S.D. Ill. 2009), and reject the "comparison approach," finding instead that Sargent & Lundy is a significant defendant because "the allegations against it form the basis for a right to relief for most or all of the members of the proposed plaintiff class." *Id.* at 1048. The court in *Anderson* declined to compare the local defendant's alleged conduct to that of the other defendants to determine whether the local defendant's alleged conduct was "as bad as or worse" than the conduct alleged against the others. *Anderson* nevertheless does not call the comparison

approach into question. The *Anderson* court, like the courts cited above, still insisted on comparing the local defendant's conduct with the "conduct that form[ed] the basis of the Complaint as a whole" to determine whether the local defendant's conduct was significant in relation. *Id.* In any event, Plaintiffs' motion would fail even under the *Anderson* court's approach: In reaching its conclusion, the *Anderson* court found that the plaintiffs' allegations were "sufficient to support a right to relief." *Id.* at 1049. As discussed in more detail below, this court has concluded that Plaintiffs' allegations do not support a right to relief against Sargent & Lundy, meaning that Sargent & Lundy is not a significant defendant even under *Anderson.* CAFA's local controversy exception, therefore, does not require the court to decline jurisdiction over this case.

In the alternative to remanding under CAFA's mandatory local controversy exception, Plaintiffs urges the court to decline to exercise jurisdiction in the "interests of justice" pursuant to 28 U.S.C. § 1332(d)(3). Having concluded that Sargent & Lundy is not a significant defendant under § 1332(d)(4)(A), the court's § 1332(d)(3) analysis may be brief. Under § 1332(d)(3), a district court may decline, "in the interests of justice," to exercise CAFA jurisdiction over a class action in which citizens of the State in which the action was filed comprise greater than one-third but less than two-thirds of the class members and in which the "primary defendants" are citizens of that State. For the court to decline to exercise jurisdiction in the interests of justice pursuant to § 1332(d)(3), therefore, Sargent & Lundy—the only Illinois defendant—must be a "primary defendant." If Sargent & Lundy is not a *significant* defendant under § 1332(d)(4)(A), however, it may not be a primary defendant under § 1332(d)(3). *See Roppo v. Travelers Ins. Co.,* No. 13-cv-5569, 2014 WL 3810580, at *6 (N.D. Ill. Aug. 1, 2014) ("[I]t follows that if [the defendant] has failed to show that the Illinois defendants are 'significant' under § 1332(d)(4)(A)(i), then the Illinois defendants cannot be 'primary defendants.'"). In addition, it seems likely that more than two-thirds of class members are Illinois citizens, and thus neither requirement of the "interests of justice" exception is met.

For the foregoing reasons, the court retains jurisdiction under CAFA, and Plaintiffs' motion to remand is denied.

## II.    Defendants' Motions to Dismiss

Having concluded that none of CAFA's exceptions preclude the court from hearing this case, the court turns now to Defendants' motions to dismiss. Defendants IMPA and Rao (Defs.' Mot. to Dismiss the Compl. and Strike Punitive Damages [14]), ISC [(Def.'s Mot. to Dismiss the Am. Compl. and Strike Punitive Damages 45]), Skelly and Loy (Def.'s Mot. to Dismiss Pls.' Am. Class Action Compl. [46]), and Sargent & Lundy (Def.'s Mot. to Dismiss Pls.' Am. Class Action Compl. [50]) have all filed motions to dismiss Plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for their failure to state a claim for relief. "In diversity cases, [federal courts] apply federal procedural law and state substantive law." *Hess v. Bresney*, 784 F.3d 1154, 1158 (7th Cir. 2015). The substantive law to be applied is the law of the state in which the federal court sits. *BB Syndication Servs., Inc. v. First Am. Title Ins. Co.*, 780 F.3d 825, 829 (7th Cir. 2015). Here, Plaintiffs' complaint alleges only state law claims for negligent misrepresentation against each Defendant. In ruling on Defendants' motions to dismiss, therefore, the court must determine whether Plaintiffs have alleged facts, pursuant to the pleading requirements of Federal Rule of Civil Procedure 8(a), that would allow them to recover against the Defendants for negligent misrepresentation under Illinois law.

At the motion to dismiss stage, the court must accept "all well-pleaded facts as true and view them in the light most favorable to [Plaintiffs] . . . ." *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015). Though Plaintiffs need not plead "specific facts," the Complaint's allegations must "state a plausible claim for relief." *Olson v. Champaign Cnty., Ill.*, 784 F.3d 1093, 1098–99 (7th Cir. 2015) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The allegations must be "more than threadbare recitals of the elements of a cause of action supported by more conclusory statements." *Id.* at 1099 (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678).

And though the court must accept all well-pleaded facts as true, it is not "bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555).

To state a claim for negligent misrepresentation under Illinois law, a party must allege:

> (1) a false statement of material fact; (2) carelessness or negligence in ascertaining the truth of the statement by the party making it; (3) an intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; (5) damages to the other party resulting from such reliance; and (6) a duty on the party making the statement to communicate accurate information.

*First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 218 Ill. 2d 326, 334–35, 843 N.E.2d 327, 332 (Ill. 2006). Of the above elements, Defendants[8] argue that Plaintiffs have failed to allege any false statements of material fact, any intention on the part of Defendants to induce any of the individual Plaintiffs to act, any action by Plaintiffs in reliance on a misstatement, or any duty on the part of Defendants to communicate accurate information to Plaintiffs. In addition, all of the Defendants other than Sargent & Lundy argue that Plaintiffs' claims are barred by the economic loss doctrine established by *Moorman Mfg. Co v. Nat'l Tank Co.*, which precludes plaintiffs from recovering for solely economic losses in negligent misrepresentation cases unless the defendant who made the misrepresentations is "in the business of supplying information for the guidance of others in their business transactions." 91 Ill. 2d 69, 89, 435 N.E.2d 443, 452 (Ill. 1982). Because the duty element in this case is related to the intent-to-induce action and the action-in-reliance elements, and because those three elements appear at first glance to be particularly problematic for Plaintiffs, the court discusses them first.

---

[8] As mentioned above, Defendants IMPA and Rao (Defs.' Mot. to Dismiss [14]), ISC (Def.'s Mot. to Dismiss [45]), Skelly and Loy (Def.'s Mot. to Dismiss [46]), and Sargent & Lundy (Def.'s Mot. to Dismiss [50]) have filed separate motions to dismiss, as well as separate replies (Defs. IMPA and Rao's Reply Br. [23]; Def. ISC's Reply Br. [55]; Def. Skelly and Loy's Reply Br. [56]; Def. Sargent & Lundy's Reply Br. [57].) Though their factual circumstances are not identical, each Defendant sets forth similar legal arguments. The court, therefore, unless otherwise noted, refers generally throughout to "Defendants' arguments."

## A.    Duty

Illinois follows the familiar rule that a party may not recover in tort for a defendant's negligence "unless the defendant has breached a duty owed to the plaintiff." *Fancil v. Q.S.E. Foods, Inc.*, 60 Ill. 2d 552, 554, 238 N.E.2d 538 (Ill. 1975).  "Whether a duty exists is a question of law for the court to decide." *Bruns v. City of Centralia*, 21 N.E.3d 684, 689, 2014 IL 116998 (Ill. 2014).  In determining whether a duty exists, Illinois courts ask "whether defendant and plaintiff stood in such a relationship to one another that the law imposed upon defendant an obligation of reasonable conduct for the benefit of plaintiff." *Id.* (internal quotation marks omitted).

Under the particular tort of negligent misrepresentation, defendants who stand in such a relationship with plaintiffs are obliged to convey accurate information to them. *See First Midwest Bank*, 218 Ill. 2d at 335, 843 N.E.2d at 332.  Plaintiffs cite *Klecan v. Countrywide Home Loans, Inc.* as providing the standard for determining whether defendants owe such a duty to a particular class of plaintiffs with whom they have no contractual relationship: "Absent contractual privity between the parties, tort liability is measured by the scope of the duty owed to foreseeable plaintiffs."  351 Ill. Dec. 548, 552, 952 N.E.2d 1212, 1215 (3rd Dist. 2011) (citing *Rozny v. Marnul*, 43 Ill. 2d 54, 250 N.E.2d 656 (Ill. 1969)).  Defendants knew that Batavia would rely on their misrepresentations, Plaintiffs argue, and Defendants knew that such reliance would lead to increased rate payments for Batavia's residents.  Batavia ratepayers were therefore "foreseeable plaintiffs" to whom Defendants owed a duty, under *Klecan* and *Rozny*, to communicate accurate information, Plaintiffs contend.  (*See* Pls.' Resp. to Mot. Dismiss [20] 5–8.)

Defendants respond that Plaintiffs misstate the appropriate duty analysis for negligent misrepresentation claims.  Defendants IMPA and Rao contend, for example, that "[w]hether a defendant knows his statement would 'impact' a potential plaintiff . . . is not the proper legal inquiry . . . ."  (Defs.' Reply to Mot. to Dismiss [23] 2.)  According to Defendants, the scope of a

defendant's duty to third parties in this context is a narrow one. (*Id.* at 3); *see Quinn v. McGraw-Hill Cos., Inc.*, 168 F.3d 331, 335 (7th Cir. 1999) ("The Illinois Supreme Court has recognized the tort of negligent misrepresentation where the defendant knew the information would be used and relied upon and the potential liability was restricted to a comparatively small group.") (internal quotation marks and citations omitted). Because the thousands of Batavia ratepayers comprising the putative class are not a "small group" and because none of the Defendants knew that Batavia's ratepayers would use and rely upon the information Defendants provided, Defendants did not, they argue, owe Plaintiffs a duty.

A review of Illinois case law supports Defendants' contention that, in the negligent misrepresentation context, defendants owe a narrow duty only to those who might foreseeably rely upon—as opposed to those who might be "impacted by"—their alleged misrepresentations. *See Quinn*, 168 F.3d at 335; *Hollywood Trucking, Inc. v. Watters*, 385 Ill. App. 3d 237, 243, 895 N.E.2d 3, 9 (5th Dist. 2008) ("Negligent misrepresentation involves the breach of a duty to use reasonable care in obtaining and communicating information *upon which others may reasonably be expected to rely* in the conduct of their business transactions.") (emphasis added). Under Illinois law, the maker of an alleged misrepresentation "is subject to liability to only those persons for whose guidance *he knows the information is to be supplied* and to them only for loss incurred in the kind of transaction in which the information is expected to influence them." *Cahill v. E. Ben. Sys., Inc.*, 236 Ill. App. 3d 517, 521, 603 N.E.2d 788, 792 (1st Dist. 1992) (emphasis added).

Indeed, in both *Klecan* and *Rozny*, the two Illinois cases upon which Plaintiffs rely, the courts held that it was foreseeable that the plaintiffs would rely upon the defendants' misrepresentations. In *Klecan*, a flood determiner erroneously reported that a home was not in a flood zone, resulting in the borrowers' decision not to purchase flood insurance for their home. The court held that the flood determiner had "reason to believe that its flood determination *would be relied upon* by [the borrowers], whose decision to purchase flood insurance would be

18

impacted by [the determination]." 351 Ill. Dec. at 552, 951 N.E.2d at 1216 (emphasis added). Similarly, in *Rozny*, where the Illinois Supreme Court first established the tort of negligent misrepresentation, the court held that the defendants *knew* that their inaccurate survey of a property would be relied upon by future users of the property. 43 Ill. 2d at 66, 250 N.E.2d at 663.

In this case, in their effort to demonstrate that the *impact* of Defendants' misrepresentations on Plaintiffs was foreseeable, Plaintiffs actually bolster Defendants' contention that Plaintiffs' *reliance* was not foreseeable. Plaintiffs emphasize that Batavia's ratepayers "do not have the option to opt out of the MEU, and thus cannot purchase electricity . . . from any other source." (Pls' Resp. to Mot. to Dismiss [20] 6.) They argue further that Defendants "would know Batavia's ratepayers had no choice where to purchase their power." (*Id.*) Plaintiffs are correct that their inability to opt out of the MEU makes it more likely that Defendants' inaccurate representations would negatively affect Plaintiffs. The fact that Plaintiffs could not opt out also makes clear that Defendants could not have expected that Plaintiffs would take any action in reliance on such misrepresentations because, as Plaintiffs admit, there was no action for them to take. Even if it were possible for Batavia's ratepayers to receive information from Defendants and take action in reliance upon it, nowhere in Plaintiffs' complaint do they allege—or allege facts to support an inference—that Defendants knew, should have known, or should have foreseen that Batavia's ratepayers, as opposed to the City itself, would rely upon any information Defendants provided.

According to Plaintiffs, to conclude that Defendants did not owe Plaintiffs a duty to convey accurate information would be to ignore the "common sense" truth that a "municipality exists for its citizens" (*id.* at 5), and would require an "innocent reliant party to carry the burden of Defendants' professional mistakes." (*Id.* at 8) (citing *Rozny*, 250 N.E.2d at 663). The court is sympathetic to Plaintiffs' claims. Assuming the truth of Plaintiffs' allegations, as the court must at this stage, a number of parties—some with a financial interest in PSEC—made false

promises and predictions about the costs and the viability of the power at PSEC, which led Batavia to enter into what now appears to be an ill-advised power agreement for which Plaintiffs must now foot the bill.  But unfortunate and unfair as Plaintiffs' predicament may appear from their complaint, their allegations do not give rise to a tort claim *for them* against *these Defendants*.  Even if Plaintiffs are correct as a matter of civics or political theory that a municipality "exists for its citizens," it does not follow that citizens may hold defendants liable in tort for a duty the defendants may have owed to the municipality.  Plaintiffs cite no authority, and the court has not found one, to support such a proposition.[9]  On the contrary, when the Illinois Supreme Court decided in *Rozny* to do away with privity as a prerequisite for tort liability, it was careful to limit the class of plaintiffs, and the size of the plaintiff classes, who might bring such actions against parties with whom they had no contractual relationship.  43 Ill. 2d at 66–67, 250 N.E.2d at 662–663.  In *Rozny*, the court recognized a right, in the third-party purchasers of a house and lot, to recover against a real estate development firm for damages resulting from an inaccurate survey.  In reaching that conclusion, the *Rozny* court warned that the factor of potential "unknown and unlimited liability" is "not to be lightly discounted" and found it relevant that "potential liability in [that] case [was] restricted to a comparatively small group, and that, ordinarily, only one member of that group will suffer loss."  *Id.*  The proposed class in the case before this court is anything but a "comparatively small group"; it is alleged to contain over 9,000

---

[9]     As discussed below, Plaintiffs do not allege that Batavia's ratepayers actually relied upon information conveyed by Defendants, and thus they are not "innocent *reliant* part[ies]" like the plaintiff in *Rozny*, 43 Ill. 2d at 67–68, 250 N.E.2d at 663 (emphasis added). Also, as unfair as it may appear to Plaintiffs, it is not uncommon, in situations where an injured party passes the costs of its injury on to third parties, for the law to allow only the initially injured party—and not the third parties to whom costs were passed—to seek legal redress for the injury.  *Cf. Illinois Brick. Co v. Illinois*, 431 U.S. 720, 746, 97 S. Ct. 2061, 2075, 52 L. Ed. 2d 707 (1977) (deciding, in the antitrust context, that antitrust law would be better served and more vigorously enforced by "holding direct purchasers to be injured to the full extent of the overcharge paid by them than by attempting to apportion the overcharge among all that may have absorbed part of it").

members. (Compl. ¶ 125.) The court believes it is highly unlikely that the Illinois Supreme Court would extend the scope of Defendants' duties to cover Plaintiffs' claims.

Plaintiffs bring this action on behalf of themselves and not on behalf of NIMPA or Batavia, entities with whom at least some of the Defendants were in privity and to whom the Defendants may have owed a duty. Had Plaintiffs attempted to bring their claims on behalf of those parties (for example, through a taxpayer derivative action), it appears unlikely that they would have standing to do so under Illinois law because their complaint "allege[s] no breach of duty by a public officer." *City of Chicago ex rel. Scachitti v. Prudential Sec., Inc.*, 332 Ill. App. 3d 353, 370, 772 N.E.2d 906, 920 (1st Dist. 2002) (emphasis removed). In *Scachitti*, residents and taxpayers of the City of Chicago brought suit on behalf of the city, alleging that securities dealers had fraudulently obtained public funds from the city and that the city's accountants had committed malpractice in allowing the fraud to occur. *Id.* at 355–358, 772 N.E.2d at 909–910. The appellate court affirmed the dismissal of the plaintiffs' common-law claims for lack of standing because their complaint "cast[] the City . . . as the unknowing victim[] of private third parties." *Id.* at 370, 772 N.E.2d at 920. The plaintiffs had failed to allege that the third parties benefited from "a public officer's breach of duty." *Id.* *Schachitti*'s holding—that plaintiffs asserting taxpayer standing must allege a breach of duty by a public officer—was affirmed by the Illinois Supreme Court in *Cnty. of Cook ex rel. Rifkin v. Bear Stearns & Co.*, 215 Ill. 2d 466, 479–481, 831 N.E.2d 563, 571–572 (2005) (affirming dismissal for lack of taxpayer standing and rejecting plaintiffs' argument that *Schachitti* was wrongly decided), and would likely make futile any attempt by Plaintiffs to bring their claims derivatively on behalf of NIMPA or Batavia.

## B. Intention to Induce Action

The court's conclusion that Defendants could not foresee that Plaintiffs would rely on their alleged misrepresentations and thus did not owe them a duty also makes it unlikely that Plaintiffs could satisfy the element of negligent misrepresentation that a defendant must intend to induce the plaintiff to act. *First Midwest Bank*, 218 Ill. 2d at 335, 843 N.E.2d at 332. In any

event, Plaintiffs fail to satisfy this element by failing to allege any such intention on behalf of Defendants.

## C.     Action in Reliance

The court has concluded that the inability of Batavia's ratepayers to opt out of the MEU, or otherwise take action in reliance upon Defendants' alleged misrepresentations, defeats Plaintiffs' allegations that Defendants owed them a duty.   That inability also undermines Plaintiffs' ability to allege that they actually relied on those misrepresentations.   To survive a motion to dismiss on a claim for negligent misrepresentation, a plaintiff must allege some "action by the [plaintiff] in reliance on the truth of the [allegedly false] statement."   *First Midwest Bank,* 218 Ill. 2d at 335, 843 N.E.2d at 332.  A negligent misrepresentation claim "require[s] a showing of *actual* reliance."   *Cahill*, 236 Ill. App. 3d at 521, 603 N.E.2d at 792 (emphasis added).   In *Cahill*, the plaintiff alleged that a medical review organization had inaccurately determined the necessary duration of his son's hospitalization, leading his insurer to cover only a portion of his son's hospital bill.   The court held that by failing to allege that he, himself, relied on the inaccurate determination, the plaintiff had failed to satisfy a necessary element of his negligent misrepresentation claim.   *Id.*, 603 N.E.2d at 792.   The plaintiff's allegation that his insurer, a third party, relied on the inaccurate determination was deemed inadequate.   *Id.*  Here, similarly, though Plaintiffs allege that Batavia took actions in reliance upon Defendants' alleged misrepresentations (Compl. ¶¶ 130, 136, 142, 149, 156), they make no such allegations of actions taken by members of the putative class.

Plaintiffs rely on *St. Joseph Hosp. v. Corbetta Constr. Co.*, 21 Ill. App. 3d 925, 316 N.E.2d 51 (1st Dist. 1974), for the proposition that the reliance alleged in a misrepresentation claim may be "indirect" (Pls.' Resp. to Mot. to Dismiss [20] 12–13), but *St. Joseph* did not do away with the requirement of actual reliance altogether.   *See St. Joseph*, 21 Ill. App. 3d at 954; *Amerigas Propane, L.P. v. BP Am., Inc.*, 691 F. Supp. 2d 844, 853 (N.D. Ill. 2010) (discussing *St. Joseph* and recognizing that though misrepresentation need not be made directly to plaintiff,

successful claim "requires reliance on the particular statement at issue").  In *St. Joseph*, a manufacturer-supplier who subcontracted to supply its wall paneling for installation in a hospital failed to disclose to either the hospital or the general construction contractor that its paneling did not comply with flammability standards in the city's building code.  *Id.* at 956.  The court ruled that the manufacturer-supplier could be liable for fraud because if it had proceeded honestly, the company "would have alerted the [hospital and the contractor] that its paneling could not possibly be used in any large hospital in [the city]."  *Id.* at 957.  The court affirmed the finding of fraud despite the lack of privity between the hospital and the subcontractor, but it did not do away with the requirement of actual reliance.  *Id.*  On the contrary, the court reiterated the traditional requirement in fraud cases that the fraudulent statement "does reach [the plaintiff] and he *does rely upon it, to his damage*."  *Id.* at 954 (emphasis added).  The plaintiff hospital in *St. Joseph* provided evidence of its own reliance: the hospital's administrator signed the order approving installation of the inadequate paneling and testified that she would have signed a change order specifying a different paneling, had she known that the subcontractor's paneling failed to comply with the city code.  *Id.* at 940.  Plaintiffs here make no such allegation of actions they took in reliance on Defendants' alleged misrepresentations, and Defendants' motions to dismiss must therefore be granted.

### D.    False Statement of Material Fact

Plaintiffs' failure (1) to adequately allege a duty on behalf of Defendants or (2) to allege any actual reliance dooms the complaint, as explained above.  The court need not address other defects asserted by Defendants, including, for example, Defendants' "economic loss" defense.  In Illinois, the *Moorman* doctrine, established in *Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69, 435 N.E.2d 443 (1982), limits the types of claims plaintiffs may bring when the only losses they seek to recover are economic in nature.  Under that doctrine, Defendants can only be liable for their alleged negligent misrepresentations if they are "in the business of supplying information for the guidance of others in their business transactions."  91 Ill. 2d at 89, 435

23

N.E.2d at 452. Analysis of that defense would require the court to address where on the spectrum of "information providers" each Defendant falls. The court will, however, flag one additional concern about Plaintiffs' complaint that might prevent even Batavia itself, let alone its ratepayers, from sustaining a negligent misrepresentation claim against Defendants. To state a claim for negligent misrepresentation, plaintiffs must allege that defendants made false statements of "material fact." *First Midwest Bank*, 218 Ill. 2d at 334, 843 N.E.2d at 332. But opinions and projections about future events of the sort Plaintiffs allege here—opinions and projections about the future costs and viability of PSEC or about the necessity of Batavia's approving the project—are generally not considered statements of material fact. *See, e.g.*, *Power v. Smith*, 337 Ill. App. 3d 827, 832, 786 N.E.2d 1113, 1118 (4th Dist. 2003) ("[A]ssurances as to future events are generally not considered misrepresentations of fact."); *GoHealth, LLC v. Simpson*, No. 13 C 02334, 2013 WL 6183024, at *10 (N.D. Ill. Nov. 26, 2013) (reviewing Illinois cases). Even if Defendants had a duty, therefore, to convey accurate statements of fact to Plaintiffs, it is not clear from the allegations in Plaintiffs' complaint that such a duty was breached here. Whether or not Defendants' representations are characterized as statements of fact or opinion, the court concludes that the lack of a duty, the failure to allege that Defendants intended to induce Plaintiffs to act, and the absence of an allegation that Plaintiffs took action in reliance upon Defendants' misrepresentations all require dismissal of the complaint.

## CONCLUSION

The court denies Plaintiffs' motion to remand [13] because it has jurisdiction under CAFA, and none of CAFA's exceptions applies because Plaintiffs failed to state a claim for relief against the only non-diverse Defendant named. Because Plaintiffs have failed to allege an adequate state law claim for negligent misrepresentation against any of the Defendants, Defendants' IMPA and Rao [14], ISC [45], Skelly and Loy [46], and Sargent & Lundy [50]

motions to dismiss are granted, and all of Plaintiffs' claims are dismissed without prejudice. Plaintiffs are given leave to file an amended complaint, if they can do so, within 21 days.

ENTER:

Dated: August 13, 2015

_____
REBECCA R. PALLMEYER
United States District Judge